**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SCOTT MONACO, et al.,

                    Plaintiffs,

vs.                                                    Case No. 3:09-cv-1169-J-32PDB

CITY OF JACKSONVILLE

                    Defendant.

_____

## O R D E R

Up to 2,000 employees of the City of Jacksonville filed this class action alleging that

the City violated the Americans With Disabilities Act by excluding them from the City's

Retirement System because of "pre existing medical conditions."  At first, the City fell on its

sword, agreeing to allow the case to proceed as a class action and enrolling all class

members into the retirement system.  Then, the City altered course and decided to contest

the case, resulting in this protracted litigation.  Following the City's change of heart, this case

came before the Court on the parties' Cross-Motions for Summary Judgment and related

filings.  In a September 11, 2012 Order (Doc. 91), the Court identified several significant and

complex legal issues that required further argument:

> Because of the complexity of the issues and the parties' evolving positions on
> them, as well as the uncertainty of how to apply the relevant law, the Court
> finds it necessary to have another hearing on the pending Cross-Motions for
> Summary Judgment. . . . [However, before doing so] the Court finds it
> appropriate to provide the parties with the opportunity to mediate the case
> before they embark on what might be a difficult and uncertain path.  Indeed,
> the parties may be able to achieve through settlement a fair and equitable
> result that might not be attainable under the law's strictures.

Order at 11-12. Thus, the Court directed the parties to participate in mediation, believing (as I still do) that they should reach a settlement. The parties mediated on December 4, 2012, and continued their settlement discussions for 10 months. (Docs. 94-99).

However, on October 2, 2013, the mediator informed the Court that the parties were at an impasse. (Doc. 102). Accordingly, the Court reopened the case and directed the parties to rebrief the matter in light of the issues identified in the Court's prior Order and the current state of the law. See Order (Doc. 104). The matter is now before the Court on the parties' renewed cross-motions for summary judgment. (Docs. 107, 109, 110, 113). The Court held oral argument on May 22, 2014. (Doc. 117; the Hearing). Following argument, at the Court's request, the parties filed proposed orders on August 15, 2014. See City's Proposed Order (Doc. 128); Plaintiffs' Proposed Order (Doc. 129).

The Court concludes that, while the City's process which resulted in excluding so many employees based on "pre-existing conditions" was, at best, haphazard, it did not violate the ADA on a class-wide basis. Thus, while some of these employees may seek to prosecute individual ADA actions against the City, this case may not proceed as a class action. Because the ADA is the only basis upon which the class has brought suit, the Court has no occasion to determine whether the City's actions violated some other local, state or federal law. However, nothing in this Order prevents the City from voluntarily offering a remedy to the employees who may have been unnecessarily excluded from the City's Retirement System. My detailed reasoning follows.

## I.   Standard of Review

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The evidence and all reasonable inferences drawn from it must be viewed in the light most favorable to the nonmoving party.  Rylee v. Chapman, 316 F. App'x 901, 905 (11th Cir. 2009).  "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment.  When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts."  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## II.   Background

### A.   Facts

The Charter for the City of Jacksonville provides that "[a]ll officers and employees of the consolidated government employed after the effective date of this Charter shall be members of . . . the retirement and pension system for the consolidated government."  Defendant's Motion, Ex. B (Doc. 68-3): Jacksonville, Fla. Charter, art. 16, § 16.01.  The City

3

of Jacksonville Retirement System (the System) consists of two separate pension plans: the General Employees Retirement Plan (GERP), and the Corrections Officers' Retirement Plan (CORP).  Defendant's Motion, Ex. B at 9: Jacksonville, Fla., Code § 120.101(b).  The City of Jacksonville's Ordinance Code (the Code) previously required all applicants for membership in either the GERP or the CORP "to undergo a physical examination for the purpose of determining pre existing medical conditions."  See Defendant's Motion, Ex. C (Doc. 68-4) at 3; see also Code § 120.302(c).  This prior version of the Code provided that "[n]o condition of health shall preclude a person elected or hired by the City from membership, but no application for disability retirement shall be based on a pre existing medical condition revealed by the physical examination provided for in this paragraph."  Id. Thus, the Code mandated that "[a]ny applicant determined to have a pre existing medical condition shall, as a condition of admission to the System, waive the right to receive a disability or pre retirement death benefit based on that condition in a form acceptable to the Board [of Trustees]."  Id.  Additionally, "[m]embership in the System shall be deemed to commence after an applicant has completed the required physical examination, has executed any appropriate waiver forms, has submitted all required enrollment forms, and shall be coincident with the first pay period in which employee contributions are made."  Id. The Code was amended, effective September 15, 2008, to remove the physical examination and waiver requirements as to the GERP.  See id.; see also Code § 120.202.  However, the Code still requires a physical examination and waiver of pre-existing conditions prior to joining the CORP.  See Code § 120.302(c)-(d).

Plaintiffs are employees of the City who, upon employment, were each required to undergo a medical examination to determine their eligibility to participate in one of the pension plans of the System. See Second Amended Complaint ¶ 5(a); Answer (Doc. 20) ¶ 5(a). As a result of medical issues revealed by the examinations, Plaintiffs were not admitted into the System at the time their employment with the City commenced. See Second Amended Complaint ¶ 5(b); Answer ¶ 5(b). Plaintiffs maintain, and the City admits, that Plaintiffs were "denied entry" into the System based on a "medical issue" identified in their examinations.[1] See Second Amended Complaint ¶¶ 5(b)-(c), 13; Answer ¶ 5(b)-(c). However, the City now argues that Plaintiffs were not actually excluded from the System, but merely delayed in entering the System because they did not complete the application process as defined in the Code, either by failing to provide the requisite waiver or by failing to provide documentation of specific medical tests. See Defendant's Renewed Motion (Doc. 109) at 3-4. Employees that were not admitted into the System participated in the federal Social Security program instead. Id. at 4.

---

[1] In the Second Amended Complaint, Plaintiffs allege, and the City largely admits, that the following medical issues were the basis for exclusion: high cholesterol, inadequate "good" cholesterol, low iron, "problems with blood work," high blood pressure, rheumatoid arthritis, blood in urine, skin cancer, "good cholesterol and glucose too high," elevated triglycerides, anemia, low hemoglobin, high, low and irregular white blood cell counts, type II diabetes, blood disorder, low platelet count, back problems, liver enzymes, and excessive weight. See generally Second Amended Complaint ¶ 13; Answer ¶ 13. In addition, Plaintiffs Christy Sames, Travell Thomas, James Chafen, and Marie Horton were allegedly given no reason for their exclusion from the System. Id. ¶¶ 13(g), (t), (y), (cc). Plaintiff Steven Mixon alleges that he was denied admission because "he did not pass the medical and physical examination," id. ¶ 13(k), and Plaintiff Sean Graham alleges that he was excluded because of "an improper physical and medical examination conducted by the City at the time of his employment." See id. ¶ 13(ww).

Plaintiffs filed this case on December 2, 2009, alleging that they were excluded from the City's System because of their actual or perceived disabilities in violation of the ADA. In apparent response to the suit, in February of 2010, the City voluntarily admitted into the System "all civil service employees who were not members, unless they specifically asked to remain in the Social Security program." See Defendant's Motion (Doc. 68) at 5, Ex. J; Plaintiffs' Supplemental Brief (Doc. 89) at 16. Having achieved membership in the System, "Plaintiffs are now seeking only equitable relief, in the form of a court order providing for the correction of their membership date back to their date of hire." See Plaintiffs' Supplemental Brief (Doc. 89) at 16. If Plaintiffs achieve this relief, it would potentially affect both the amount of their retirement benefit and how long they have to remain with the City to receive the maximum benefit.

### B.    Class Action

On March 1, 2010, Plaintiffs moved to certify this case as a class action. See Motion to Certify Class (Doc. 16). Significantly, the City agreed to class certification subject only to the limitation that the City denied that the Class Members have any "entitlement to a reduced-price buy-back." See City's Response to Motion for Class Certification (Doc. 19) at 1. The Court held a hearing (Doc. 22), and on June 21, 2010, entered an Order (Doc. 35) granting class certification. Both parties agreed to the form of the Court's Order. See Order at 2-3.

In the agreed class certification Order, the Court stated that the number of City employees who Plaintiffs assert were wrongfully excluded from the pension plans, although

difficult to determine precisely, exceeds 1,500 individuals.  Order at 4.  In addition, the

parties agreed, and the Court held, that the following questions of law or fact were common

to the members of the Class:

> (a) whether the City improperly subjected Plaintiffs and the class members to medical examinations and considered the results of those medical examinations as grounds for excluding Plaintiffs and the members of the Classes from participating in the GERP and CORP;
>
> (b) whether such conduct was violative of the ADA and the Rehabilitation Act; and
>
> (c) the extent to which Plaintiffs and the members of the Classes have sustained damages.

Order at 4.  The Order further states, as the parties agreed, that the question of "whether the

City engaged in a uniform and standardized course of conduct of improperly using medical

diagnoses from physical examinations to exclude members from the [System], and depriving

them of benefits thereunder in violation of the City's Code" was a question of fact or law that

"predominate[s] over any questions affecting only individual members of the Classes."  Id.

at 6-7.  For those reasons, inter alia, the Court directed that this case proceed as a class

action on behalf of two classes

> consisting of current employees of the City of Jacksonville who were: 1) excluded from participating in [the System] and remain excluded ('Class 1'); and 2) excluded from [the System] during their employment but later were permitted to buy back into the [System] without being provided all required and proper credits and/or benefits ('Class 2').

Id. at 8.  The two classes are further divided into five sub-groups based on the class

member's length of service with the City.  Id.  A Court-approved Notice of Class Certification

was sent to the Class Members about August 20, 2010.  See id. at 9.

### III.    Analytical Framework

#### A.    Applicable Law

Plaintiffs allege that the City violated the ADA and Rehabilitation Act by excluding the Class from the System because those employees have or were perceived to have disabilities.[2]  To prove disability discrimination, "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA."  See Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003); see also Schwarz v. City of Treasure Island, 544 F.3d 1201, 1209 (11th Cir. 2008) (noting three distinct theories of disability discrimination: disparate treatment, disparate impact, and failure to reasonably accommodate).  In Raytheon, the Supreme Court instructs courts to carefully distinguish between the disparate treatment and disparate impact theories because "'the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes.'"  See Raytheon, 540 U.S. at 53 (quoting Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252 n.5 (1981)).  Here, Plaintiffs' claims are premised on their contention that the City engaged in a pattern or practice of intentionally excluding individuals

---

[2] "Discrimination claims brought under the Rehabilitation Act are governed by the same standards as those brought under the Americans with Disabilities Act."  See Jeudy v. Attn'y Gen., Dep't of Justice, No. 11-15838, 2012 WL 3031229, at *1 (11th Cir. July 26, 2012). Accordingly, for ease of reference, the Court will refer only to the ADA in conducting its analysis of Plaintiffs' ADA and Rehabilitation Act claims.  Knowles v. Sheriff, 460 F. App'x 833, 835 (11th Cir. 2012) ("Claims brought under the Rehab Act . . . are analyzed under the same framework as the ADA, and, thus, need not be addressed separately.").

In addition, Plaintiffs bring their claims under Title II of the ADA which governs public entities.  See 42 U.S.C. § 12132.  In Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist., 133 F.3d 816 (11th Cir. 1998), the Eleventh Circuit held that Title II encompasses public employment discrimination.  Bledsoe, 133 F.3d at 820-25.

with actual or perceived disabilities from the System because of those disabilities.  See

Plaintiffs' Motion at 14, 31-32.  Crucially, Plaintiffs are relying only on a disparate treatment

theory of relief and must demonstrate intentional disability discrimination to succeed on their

claims.[3]  See Raytheon, 540 U.S. at 52 ("Liability in a disparate-treatment case depends on

whether the protected trait . . . actually motivated the employer's decision." (internal

quotation omitted)).

In the absence of direct evidence, a plaintiff may prove "disparate treatment in

disability cases 'through circumstantial evidence using the familiar burden-shifting analysis

employed in Title VII employment discrimination cases.'"  See Nadler v. Harvey, No. 06-

12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007) (quoting Wascura v. City of S.

Miami, 257 F.3d 1238, 1242 (11th Cir. 2001)).  This analysis, known as the McDonnell

Douglas burden-shifting analysis, is a three step process:

> (1) A plaintiff establishes a prima facie case of disparate treatment; (2) a
> defendant articulates a legitimate, non-discriminatory reason for the
> challenged action; and (3) a plaintiff meets the ultimate burden of proof by
> proffering sufficient evidence to create a genuine issue of material fact as to
> whether each of the defendant's proffered reasons is pretextual.

Id. (internal quotations omitted).  "To establish a prima facie case of [disparate treatment]

discrimination under the ADA, a plaintiff must show that, at the time of the adverse

employment action, he had a disability, he was a qualified individual, and he was subjected

---

[3] When questioned by the Court at the Hearing, counsel for Plaintiffs stated that Plaintiffs
are proceeding on a theory of disparate treatment. (Doc. 120; Hrg. Tr. at 51, 58-59). In their
Proposed Order, Plaintiffs also emphasize that this is a disparate treatment case. See
Proposed Order at 15.

to unlawful discrimination because of his disability."  See Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014).[4]  The Supreme Court promulgated the McDonnell Douglas burden-shifting analysis to address "the order and allocation of proof in a private, non-class action challenging employment discrimination."  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973) (emphasis added).  As such, "the neat pattern of shifting inferences provided by McDonnell Douglas is not directly applicable to class actions."  See Perryman v. Johnson Prods. Co., Inc., 698 F.2d 1138, 1143 (11th Cir. 1983).

Rather, in the class action context, the class establishes intentional discrimination by demonstrating that "'discrimination was the company's standard operating procedure – the regular rather than the unusual practice.'"  See Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 & n.9 (1984) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)).  This theory of liability, known as "pattern or practice discrimination," also requires proof of discriminatory intent.  E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273 (11th Cir. 2000).  In a "pattern or practice" case, the factual issues are "simply whether

---

[4] "In contrast, disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group."  E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000). To establish a prima facie case of disparate impact discrimination, a plaintiff must provide evidence showing "'(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices,'" as well as "a causal connection between the policy at issue and the discriminatory effect."  See Quad Enters. Co., LLC v. Town of Southold, 369 F. App'x 202, 205-06 (2d Cir. 2010) (quoting Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003)).  Plaintiffs are not proceeding under a disparate impact theory.

there was a pattern or practice of such disparate treatment and, if so, whether the differences were [premised on the protected characteristic]." Teamsters, 431 U.S. at 335.[5]

In Teamsters, the Supreme Court set forth the framework for establishing this type of "pattern or practice" claim. See Teamsters, 431 U.S. at 360-62.  Rather than following the McDonnell Douglas framework, pattern or practice claims are litigated in two stages.  See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 966 (11th Cir. 2008).  At the initial "liability" stage, the plaintiff bears the burden "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers," but the plaintiff is "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." Teamsters, 431 U.S. at 360.  Pattern or practice cases are variants of the disparate treatment theory such that "'proof of discriminatory motive is critical,'" however "statistical evidence often is used to establish the existence of a pattern or practice." Joe's Stone Crab, Inc., 220 F.3d at 1287 (quoting Lujan v. Franklin Cnty. Bd. of Educ., 766 F.2d 917, 929 (6th Cir. 1985)).  "A plaintiff may establish a pattern or practice claim 'through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.'" Id. (quoting Mozee v. Am. Commercial Marine Serv. Co., 940 F.2d 1036, 1051 (7th Cir. 1991)).  If the plaintiff establishes a prima facie case that a discriminatory policy

---

[5] In Chin v. Port Auth. of NY & NJ, 685 F.3d 135, 147-50 (2d Cir. 2012), the Second Circuit sets out a helpful discussion of the "pattern or practice" method of proof.  The Chin Court observes that "[a]lthough the Teamsters framework is not a freestanding cause of action, courts – including the Supreme Court – sometimes loosely refer to the Teamsters method of proof as a 'pattern-or-practice claim.'" See id. at 149 n.8.

existed, "[t]he burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360.  If the defendant fails to do so and the court finds an ongoing practice of discrimination against the plaintiff class, the court "may then conclude that a violation has occurred and determine the appropriate remedy."  Teamsters, 431 U.S. at 361; Davis, 516 F.3d at 966.[6]

The second or remedy stage is where "individual class members may seek redress for injuries sustained, perhaps in separate proceedings."  Davis, 516 F.3d at 966.  At that stage, the defendant "bears the burden of proving that the challenged decision, made when the discriminatory practice was in force, was not made in pursuit of that practice but was, instead, made because that claimant was unqualified for the benefit he sought."  Id.  However, if the named plaintiff fails to establish the alleged pattern or practice at the initial stage, the class claim is dismissed and "all that remains are the claims of the individual class members, and those claims will be litigated under the familiar McDonnell Douglas burden-shifting framework."  See id.  The Teamsters "pattern or practice" method of proof may be utilized by the government or in private class actions, but is not available to individual private plaintiffs.  See Cooper, 467 U.S. at 876 n.9 (noting that the elements set forth in Teamsters for prima facie pattern-or-practice cases are the same in a private class action); Davis, 516 F.3d at 967-68

---

[6] Notably, "if the court finds the alleged pattern or practice to have been maintained, but does not issue an injunction because the likelihood that the practice will continue is nil, the court may enter a declaratory judgment, and the case will proceed to the second stage as if injunctive relief had been entered as well."  See Davis, 516 F.3d at 966 n.22.

(explaining that "private pattern or practice claims for such relief must be litigated either as class actions or not at all").

The Teamsters framework applies to private-plaintiff class action cases for Title VII discrimination, see Joe's Stone Crab, Inc., 220 F.3d at 1286-87.  However, few courts have addressed whether Teamsters applies in private-plaintiff class actions under the ADA.  See Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 179 n.11 (3d Cir. 2009); Bates v. United Parcel Serv., Inc., No. C99-2216 TEH, 2004 WL 2370633, at *20 (N.D. Cal. Oct. 21, 2004).  Indeed, the Court has found only one case where Teamsters was applied in a private-plaintiff, class action, ADA discrimination case.  See Bates, 2004 WL 2370633, at *20 ("Whether Teamsters applies to a pattern-or-practice case brought by a class of private individuals under the ADA appears to be an issue of first impression.").[7]  Courts have allowed the pattern or practice framework in ADA discrimination cases brought by the government.  See United States v. City & Cnty. of Denver, 943 F. Supp. 1304, 1305-06 (D. Colo. 1996); E.E.O.C. v. J.B. Hunt Transp., Inc., 128 F. Supp. 2d 117, 124 (N.D.N.Y. 2001); E.E.O.C. v. Murray, Inc., 175 F. Supp. 2d 1053, 1059-60 (M.D. Tenn. 2001).

_____

[7] The district court in Bates applied Teamsters to a private-plaintiff ADA class action.  See Bates, 2004 WL 2370633, at *20-24.  However, on appeal, the Ninth Circuit held that applying the burden-shifting Teamsters protocol was unnecessary in that case because "whether the employer made an employment decision on a proscribed basis . . . is not in dispute."  See Bates v. United Parcel Serv., Inc., 511 F.3d 974, 988 (9th Cir. 2007).  As such, the Ninth Circuit did not address whether Teamsters is the appropriate framework to apply when the existence of the allegedly discriminatory policy is at issue, as it is in this case.  See id.; see also Hohider, 574 F.3d at 179 n.11.

13

**B.     Discussion**

Plaintiffs seek to proceed under the pattern or practice theory discussed in <u>Teamsters</u>. As such, in their Motion for Summary Judgment, Plaintiffs request summary judgment on the "stage one" liability stage of the proceedings.  <u>See</u> Plaintiffs' Renewed Motion (Doc. 107) at 1, 24.  The City argues that disability discrimination claims, unlike the racial discrimination claims at issue in <u>Teamsters</u>, require individualized assessments to determine whether each claimant is "disabled" within the meaning of the ADA.  <u>See</u> Defendant's Renewed Motion (Doc. 109) at 20-22.  In contending that <u>Teamsters</u> is inapplicable here, the City relies on cases denying class certification in ADA discrimination cases because the issue of whether a plaintiff is "qualified" and "disabled" within the meaning of the ADA is too individualized for class relief.  <u>See</u> Defendant's Response at 17 (citing <u>Hohider</u>, 574 F.3d at 196 and <u>Chedwick v. UPMC</u>, No. 07-806, 2011 WL 1559792, at *18-19 (W.D. Pa. Apr. 21, 2011)).

However, <u>Hohider</u> and <u>Chedwick</u> are distinguishable in that, here, with the City's express consent, the Court previously granted class certification.  <u>See</u> Order (Doc. 35); <u>see also</u> Hrg. on Mtn for Class Certification Tr. (Doc. 28) at 8.  Unlike in those cases, the parties before the Court agreed that whether the City violated the ADA is a question capable of class-wide resolution, and that this case should proceed as a class action.  While the City's enthusiasm for the class-action mechanism has certainly waned, it has not filed a motion to decertify the class.  Thus, because this case comes before the Court on summary judgment as a class-wide disparate treatment claim, the pattern or practice method of proof and therefore, the <u>Teamsters</u> framework, appears to be appropriate.  <u>See</u> <u>Cox v. Am. Cast Iron</u>

14

Pipe Co., 784 F.2d 1546, 1551 (11th Cir. 1986) (characterizing a Title VII pattern or practice case as "class disparate treatment"); Davis, 516 F.3d at 965; see also Cooper, 467 U.S. at 876.

Moreover, the concerns articulated in Hohider and Chedwick regarding the need for individualized assessments are not an impediment here.  The City does not appear to contest that the members of the Class, all of whom are current City employees, constitute "qualified" individuals within the meaning of the ADA.  See Defendant's Renewed Motion at 22-23.  With respect to the "disability" assessment, Plaintiffs argue that the Class Members are "disabled" under the old and new versions of the ADA because the City "regarded" the Class Members as disabled within the meaning of the ADA.  See Plaintiffs' Renewed Motion at 6-14.[8]

---

[8] Congress recently amended the ADA by adoption of the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (ADAAA), effective January 1, 2009.  The Court will refer to the current, amended version of the ADA as the ADAAA, and the prior version of the law as the ADA.  Significant to this case, the ADAAA substantially amends the meaning of "disability" under the statute:

> (1) Disability
> The term "disability" means, with respect to an individual--
>> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; . . .
>> (C) being regarded as having such an impairment (as described in paragraph (3)).
> . . .
> (3) Regarded as having such an impairment
> For purposes of paragraph (1)(C):
>> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>> (B) Paragraph (1)(C) shall not apply to impairments that are transitory

(continued...)

According to Plaintiffs, the City had a practice of intentionally excluding employees from the System if their pension physicals revealed a medical issue, and Plaintiffs maintain that this practice demonstrates that the City regarded these employees as substantially impaired in their ability to work in the future.  Setting aside whether this argument is legally viable, for purposes of determining whether the pattern or practice method of proof applies, it is significant that this theory of "disability" does not require an individualized assessment of the Class Members' specific medical conditions.  Rather, to prove that the Class Members are "disabled" under this theory, Plaintiffs must show factually that such a policy existed, and legally, that applying this policy to an employee, regardless of the underlying medical condition, constitutes "regarding" that employee as disabled within the meaning of the ADA. These questions pertain to a uniform practice and therefore, they are capable of resolution on a class-wide basis.[9]  Because the parties agreed to proceed as a class action, and given the

_____

[8](...continued)
        and minor. A transitory impairment is an impairment with an actual or
        expected duration of 6 months or less.

42 U.S.C. § 12102(1), (3). Under the prior version of the statute, the "regarded as" provision defined disability as "being regarded as having such an impairment," and did not contain the current paragraph (3) which broadens the definition. See 42 U.S.C. § 12102(2) (eff. to Dec. 31, 2008).

[9] Plaintiffs also contend that some of the Class Members are actually disabled within the meaning of the ADA, and therefore the City discriminated against individuals with actual disabilities as well.  Plaintiffs' Motion at 17-18.  However, even if Plaintiffs can show that a handful of Class Members suffer from actual disabilities, absent a showing that all or most of the Class Members are disabled, this evidence would fail to demonstrate a "pattern or practice" of intentional disability discrimination.  A practice which excludes from the pension disabled and non-disabled alike is not disparate treatment.  Thus, Plaintiffs' ability to prove a pattern or practice of intentional disability discrimination is contingent on Plaintiffs' ability
(continued...)

particular facts of this case, the Court determines that Plaintiffs may travel under the pattern or practice method of proof and the Teamsters framework. See Cox, 784 F.2d at 1551; Davis, 516 F.3d at 965; see also Cooper, 467 U.S. at 876.

## IV.    Liability

Having determined that Plaintiffs may employ Teamsters, the Court next considers whether Plaintiffs have offered sufficient evidence of a pattern or practice of intentional discrimination in violation of the ADA. See Teamsters, 431 U.S. at 360. Plaintiffs must show not merely a discriminatory practice, but one that is unlawful under the ADA. See J.B. Hunt Transp., Inc., 128 F. Supp. 2d at 124-25; Hohider, 574 F.3d at 189-90. As such, Plaintiffs must demonstrate a pattern or practice that discriminates against qualified individuals on the basis of disability. See 42 U.S.C. § 12112(a); J.B. Hunt Transp., Inc., 128 F. Supp. 2d at 125. The parties do not dispute that the Class Members are qualified individuals, therefore, the questions before the Court are whether Plaintiffs have demonstrated a pattern or practice of (1) discrimination, (2) against individuals with disabilities within the meaning of the ADA, and (3) on the basis of disability. See Mazzeo, 746 F.3d at 1268; J.B. Hunt Transp., Inc., 128 F. Supp. 2d at 124. Because the allegations in this case span a period governed by both the old and new versions of the ADA, both versions of the statute apply. See Mazzeo, 746 F.3d at 1267 (citing McElwee v. Cnty. of Orange, 700 F.3d 635, 642 n. 5 (2d Cir. 2012) ("The ADAAA became effective on January 1, 2009, and applies to claims . . . which arose after that date.")); Tarmas v. Sec'y of Navy, 433 F. App'x 754, 762 n.9 (11th Cir. 2011); Fikes

⁹(...continued)
to  show that the City regarded all or most of the Class Members as disabled.

v. Wal-Mart, Inc., 322 F. App'x 882, 883 n.1 (11th Cir. 2009) (noting that a presumption against retroactive application applies in the absence of Congressional expression to the contrary and applying "the ADA as it was in effect at the time of the alleged discrimination").

## A.    Pattern or Practice Evidence

The parties appear to agree on the essential contours of the City's practice, but disagree as to whether that practice violated the ADA. The City required Class Members "to undergo a physical and medical examination to determine each [person's] eligibility to participate in one of the plans of the" System. See Second Amended Complaint ¶ 5(a); Answer ¶ 5(a). These medical examinations were referred to as the "pension physical" or "pre-pension physical." See Plaintiffs' Motion, Ex. 1 (Doc. 67-1; Ray Dep.) at 38, 82. If the pension physical revealed a pre-existing medical condition, Class Members were denied entry into the System. See Second Amended Complaint ¶ 5(c); Answer ¶ 5(c).[10] City official Calvin Ray testified that "[h]igh blood lipids, hypertension, [and] diabetes" were "typically" the medical issues found in the pension physical which resulted in a denial of entry into the System. See Ray Dep. at 38.[11] Additionally, Plaintiffs present evidence that Class Members

---

[10] Plaintiffs alleged in paragraph 5(c) of the Second Amended Complaint that "[b]ased solely upon the results of the improperly conducted physical and medical examination which revealed the condition or conditions set forth in section 6, below, [Plaintiffs] are, or were regarded by the City as, being an individual with a 'disability,' . . . ." Second Amended Complaint ¶ 5(c). The City answered: "Denied that the City regarded such persons as disabled; admit that the City denied entry based on a medical issue." Answer ¶ 5(c).

[11] Ray began working for the City in the 1970's as a budget analyst. Ray Dep. at 73. From 1998 until October 2005 he was the Director of Finance and Administration for the City, and from 2005 until January 2008 he served as the Deputy Director of Finance and Administration. Id. at 74-75. He retired in 2008 but after seven weeks, returned to work for
(continued...)

were denied entry based on a wide variety of medical conditions revealed during pension physicals such as diabetes, brain aneurysms, high cholesterol, Hodgkin's disease, hepatitis C, high triglycerides, high liver enzymes, inactive sarcoidosis, cancer, high blood pressure, kidney stones, arthritis, sickle cell anemia, Chron's disease, depression, post-traumatic stress disorder, excessive weight, poor eyesight and hearing, and debilitating injuries from a motorcycle accident.  See generally Plaintiffs' Motion, Ex. 2 (Doc. 70-1); Plaintiffs' Response, Ex. 3 (Doc. 75-4); Notice (Doc. 78)[12]; see also supra note 1.

However, in accordance with the City Code, a Class Member could join the System, despite the presence of a pre-existing medical condition, if he or she executed a waiver.[13]

_____

[11](...continued)
the City part-time on "[s]pecial projects as assigned by the chief administrative officer and more recently by the director of finance, the chief financial officer."  Id. at 62-63, 77.

[12] The City objects to the Court's consideration of these affidavits because they are "conclusory," "unsupported by any documentation or specific facts," and "fall outside the statute of limitations for the claims stated in the Second Amended Complaint."  City's Motion to Strike (Doc. 74) at 2.  The Court denied the City's Motion to Strike, see Order (Doc. 91) at 10 n.10, but indicated that it would consider these arguments as evidentiary objections.  See Rule 56(c)(2).  The Court will discuss the evidentiary value of these affidavits below.

[13] The Court finds Plaintiffs' argument that the City may not legitimately raise this "waiver" defense to be without merit.  See Plaintiffs' Renewed Motion at 4-5.  Although the City admitted that Plaintiffs were denied entry into the [System] based on a "medical issue," the City's explanation that employees could still gain entry into the System if they signed a pre-existing condition waiver does not contradict the City's admission.
        In addition, the Court rejects Plaintiffs' contention that the City "waived" its waiver argument because it failed to include this defense in its Answer.  Id. at 3.  The City has argued that Plaintiffs failed to complete the application process, including the waiver of pre-existing conditions, consistently throughout this case.  Plaintiffs have had multiple opportunities to address this defense and have availed themselves of those opportunities.  Although the Court questions whether this argument is a type of affirmative defense which must be raised in an Answer, even if it is, in the absence of any showing that Plaintiffs were
(continued...)

The waiver pertained to a component of the System which provided a disability benefit to employees who became disabled prior to retirement, unless the disability arose from a pre-existing condition.  Thus, prior to September 2008, the City Code required any employees with pre-existing medical conditions to "waive the right to receive a disability or pre retirement death benefit based on that condition in a form acceptable to the Board [of Trustees]" as a "condition of admission to the System."  See Defendant's Motion, Ex. C (Doc. 68-4) at 3.  Although the Code stated that "[n]o condition of health shall preclude a person . . . from membership . . . ," it further provided that  "[m]embership in the System shall be deemed to commence after an applicant has completed the required physical examination, has executed any appropriate waiver forms, has submitted all required enrollment forms, and shall be coincident with the first pay period in which employee contributions are made."  Id. (emphasis added).  The Class Members are City employees who were not placed in the System "[b]ecause they had some medical issue identified on their pension physical and, for whatever reason, had not executed the waiver."  Ray Dep. at 38.

_____

[13](...continued)
prejudiced by the City's failure to do so, the Court rejects Plaintiffs' argument that the City waived this defense.  See Edwards v. Fulton Cnty., Ga., 509 F. App'x 882, 887-88 (11th Cir. 2013) ("[A] defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff.").  Moreover, Plaintiffs' contention that the City asserted the "waiver" defense only as to appointed employees is mistaken. Plaintiffs' Renewed Motion at 3-4.  The "waiver" defense in the Answer as to appointed employees pertains to an argument that appointed employees had the ability to "opt-out" of the System, and thus the City raised a defense that those employees had "waived" their right to join the System.  This is an entirely different argument than the City's contention here that the civil service employees were not placed in the System because they failed to complete the required waiver form.

Chad Poppell explained the City's process for notifying Class Members of the waiver requirements:

> whenever an employee goes through the process, if there were to be an issue that would keep someone out of the pension plan, they are presented with a document that gives them two options.  Option A is to go back – they have six months to work with their personal physician to get the issue cleared up.  And they can present their personal physician's information to our City's M.R.O., and they can get in after having cleared up the problem.  Or they could go and initiate the waiver process and get in under a waiver.

Defendants' Motion, Ex. F (Doc. 69-1; Poppell Dep.) at 26-27.[14]  However, Poppell only has knowledge of the process itself and cannot verify that the letters from the City to the employee regarding the need for a waiver actually went out or how many people received them.  Id. at 28.  Ray testified to a similar process:

> That process is embedded in the human resources division intake process and, in general, that program requires that once the results of the pension physical are received by HR, if there is a circumstance or condition that would require waiver, the process sent a letter to the employee stipulating to that effect.

Ray Dep. at 16.

In its initial summary judgment briefing, the City submitted the following records of the waiver process: (1) a July 27, 2009 letter from a doctor to the City following an employee's pension physical recommending "a waiver for hyperlipidemia and any related conditions and also for any related conditions secondary to abnormal CBCs," (2) a "Waiver Request/Release Form" dated May 26, 2009, and (3) a letter from the City to an employee

---

[14] Poppell began working for the City in 1999 as a human resources analyst.  Poppell Dep. at 7.  During his career with the City he has served as Chief of Organizational Support, Manager of Personnel Services, and Chief Human Resources Officer.  Id. at 8-9.  He is currently the Director of Employee Services at the Jacksonville Electric Authority.  Id. at 9-10.

21

indicating that a waiver form was enclosed and explaining that the waiver excludes the employee from "death and disability benefits due to the noted reason(s) listed below, for which you failed the Pension physical, as well as any other pre-existing conditions."  See Defendant's Motion, Ex. D (Doc. 68-5) at 4.   The letter states that "[i]f you desire to join the General Employees Pension Plan upon these terms, please sign, notarize and return enclosed waiver(s) to me."  Id. at 5.   The City also produced the "Waiver of Death and Disability Benefits of General Employee Pension Plan" signed by the employee on September 8, 2009, and received by the Board of Pension Trustees on September 10, 2009. Id. at 7.  Upon filing its Renewed Motion, the City offers twenty-four additional sets of these documents, in various stages of completion, eight of which pertain to named Plaintiffs.  See Defendant's Renewed Motion, Exs. S-T.[15]  The dates on these documents span a time frame from 2004-2009.  At the Hearing, the parties were unable to answer many of the Court's questions or explain the sparseness of the record.[16]   Following the Hearing, at the

_____

[15] Plaintiffs contend that the Court should not consider the waiver forms filed by the City with its Renewed Motion.  See Plaintiffs' Renewed Motion at 2.  Although the City's failure to present these waivers at an earlier stage in these proceedings is curious, the Court's October 30, 2013 Order terminated the prior motions for summary judgment and directed the parties to submit new motions for summary judgment.  See Order (Doc. 104).  Thus, the parties were not prohibited from submitting additional evidence with their renewed motions and the Court will consider these documents.  Significantly, Plaintiffs do not assert that these documents were previously undisclosed or that they have suffered any prejudice by the City's decision to file them at this time.  See Plaintiffs' Renewed Motion at 2.

[16]

    THE COURT: So where is . . . Mr. Braswell [plaintiffs' attorney]?  Where is . . . Mr. Sugarman?  Where are all these other people that are the people that– so if you're getting ready to tell me you're not going to be able to answer my questions, I'm not going to like that very much at all.  So I assume you're going

(continued...)

---

[16](...continued)
    to be able to.

    MR. WARMAN:  I can try my best, Your Honor. But, again, I apologize. For me, it was–  from my firsthand knowledge, I'm going to be extraordinarily limited.

    THE COURT: What good is that going to do me?

    MR. WARMAN: At this point, sir, candidly, not very good, if that's the area into which you–

    THE COURT: I mean, here we are after all these years coming before the court on cross-motions for summary judgment in this case, and I'm going to want to ask anything I possibly want to ask about this case, the history of it, class certification, the answers in the case that the City has given– I'm going to want to know what the record is.  I'm going to– the City told me at one point they had produced 80,000 pages of stuff. I don't know what that stuff is. It doesn't appear that it has much to do with the actual individuals involved in the case, so I don't know what it was.  So we're going to have a hard time if you can't answer those questions. And it doesn't sound like you can.

    MR. WARMAN: I would be less than candid, sir, if I told you I could. . . .

(Doc. 120; Hrg. Tr. at 4-5).  When asked why his partners who had handled the case were not present, Mr. Warman responded:

    And at a certain point– and I say this, you know, colloquially, not– but I think there can be fatigue when one keeps reviewing the cases.  So as to have a different perspective on the legal argument, we had– and I'm sure you're–

    THE COURT: You know, I don't really get the luxury of having that fatigue.

    MR. WARMAN: I understand. I understand.

Id. at 6.  Mr. Warman later allowed how "fatigue" "was a poor choice of verbiage . . . ."  Id. at 8.  Later, the Court addressed the City's attorney:

(continued...)

23

Court's request, the City filed all of the waiver-related documents concerning Class Members that it uncovered, which, in total, pertain to ninety-four employees, including employees whose waiver documents the City previously submitted.  <u>See</u> Notice of Filing (Doc. 124) at 1.  Obviously, this is far short of the up to 2,000 members of the Class who were denied entry into the System.  While this record is scant, Plaintiffs' counsel stated at the Hearing that he had no reason to challenge the existence of the waiver process as testified to by Poppell

---

[16](...continued)
> THE COURT: All right. So [the City] agreed to this class in 2010.
>
> MS. LAQUIDARA: Yes.
>
> THE COURT: [W]hen I get a minute, I'm going to read to you the parts of the order that you agreed to have entered, because they don't seem to really be quite consistent with the positions you're taking now. But we'll put that to the side. . . .
>
> THE COURT: All right. And how many people of these 2,000 people– how many of these letters where you sent . . the . . . waiver forms [to the Class Members]– how many . . . pieces of paper [does the City have] to show that you did that?
>
> MS. LAQUIDARA: Fewer– my recollection, Your Honor, is fewer than 200.  [It turned out to be 94.]
>
> THE COURT: Okay. So 10 percent?  [It turned out to be five percent.]
>
> MS. LAQUIDARA: Yes. We have testimony– we have our affidavit and depositions that it was a business practice to hand them to–
>
> THE COURT: But not a business practice to make a copy of the letter?
>
> MS. LAQUIDARA: Your Honor, the– the records are in disarray. To this date, we still do not have, in 2014, a document management system in the City of Jacksonville.

<u>Id.</u> at 15, 18-19.

and Ray, although counsel added his contention that the City administered the process sporadically.  (Doc. 120; Hrg. Tr. at 52).

Indeed, the experiences of the Class Representatives exemplifies the inconsistency and confusion surrounding the City's administration of the System vis-a-vis pre-existing conditions.  Class Representative Edwin Hernandez began working for the City in 1995 and joined the System in 2001.  See Defendant's Motion, Ex. L (Doc. 69-6; Hernandez Dep.) at 11.   Although Hernandez does not remember receiving it, the City presents a letter, addressed to Hernandez and dated October 26, 1995, informing him that "additional medical information is required before you may apply for membership" in the System. See Defendant's Motion, Ex. P (Doc. 67-17); Hernandez Dep. at 26-27.  Hernandez testified that he's "almost positive medical people or somebody there told me that I had the job, but I wasn't put on the pension because of my medical problems," specifically diabetes, hypertension, and cholesterol.  Id. at 23.  However, when Hernandez took another medical examination in 2001, the results still showed "type two diabetes, obesity, GERD," yet, at that time, he was recommended for the System.  See id. at 39, 41; Defendant's Motion, Ex. R (Doc. 68-19).  Hernandez is currently in the System.[17]  See Hernandez Dep. at 11.

Class Representative Christy Sames testified that after she took the pension physical, she did not hear back from anyone and did not realize that she was not in the System for "at least two years."  See Defendant's Motion, Ex. I (Doc. 69-4; Sames Dep.) at 18.  She did not speak with any one in Human Resources or in the pension office, and does not know why

---

[17] The record does not reflect whether Hernandez was required to sign a waiver for these conditions.

she was kept out of the pension, but "assume[s] it was for medical reasons . . . ." <u>See</u> Sames Dep. at 20, 28.  The City produced a letter addressed to Sames dated December 6, 1999, which states that "additional medical information is required before you may apply for membership in the City of Jacksonville's General Employees Pension Plan." <u>See</u> Defendant's Motion, Ex. M.  In the letter, the City requests that Sames submit "the results of a Pap smear" to Human Resources. <u>Id.</u> Sames testified that she never received that letter.  Sames Dep. at 21.

Class Representative Kenneth Tanner testified that he took at least three pension physicals, first in 2001, then in 2004, and again in 2009, but was not placed in the System. <u>See</u> Defendant's Motion, Ex. K (Doc. 69-5; Tanner Dep.) at 24, 33.  Tanner is a corrections officer who began working for the City in 2001. <u>Id.</u> at 15.  According to Tanner, he was never given any reason why he was not placed in the System. <u>Id.</u> at 31-33.  The City submits a Waiver Request/Release Form signed by Tanner and dated July 6, 2009, in which he applied "for a waiver of consequences of a pre-existing condition in order to participate in the City of Jacksonville Retirement System," and an email exchange between two city employees regarding the need to obtain a letter from Tanner's doctor because he requested a waiver for the pension.  <u>See</u> Defendant's Supplemental Motion, Ex. S at 40-41.  It is unclear whether Tanner completed the waiver process, but he was placed in the System in February 2010.  <u>See</u> Tanner Dep. at 44-45.

Class Representative Lynette Clinch began working for the City in approximately 1989, and joined the System in 1994.  Defendant's Motion, Ex. H (Doc. 69-3; Clinch Dep.) at 15-16, 23.  Clinch testified that "the lady at the pension told me that the reason I was

26

denied was for medical." Clinch Dep. at 15. According to Clinch, after her preemployment physical "[o]ne of the ladies that was doing the hiring" told her that she "passed the physical, but I just didn't pass the pension." Id. at 16-17. She testifies that she kept calling the pension office to find out why she was not in the System and that "it took a while before they would tell me that I could go back and retake the physical." Id. at 17-18. According to Clinch, when she went in for the second physical the doctor told her she passed. Although she cannot remember whether it was the pension office or the doctor, she testifies that at the time of her second physical she found out that the reason she failed the first physical was because she was overweight. Id. at 20-22.

Although the precise number is unclear, Plaintiffs estimated that there were 1,500 Class Members when the Court entered the Order granting class certification, see Order (Doc. 35) at 4, and at the May 22, 2014 Hearing, counsel for the City recalled that the list of people who received the class notice contained approximately 2,000 names. (Doc. 120; Hrg. Tr. at 17). In any event, as a result of the City's practices, it appears that approximately 1,500 - 2,000 current City employees were denied entry into the System for at least some period during their employment with the City. Pursuant to the City Code, "full-time civil service employees not eligible for membership in another City-sponsored pension plan shall become members of the Plan." City Code §§ 120.202, 120.302 (emphasis added). Thus, these employees were "supposed to be" in the System. See Ray Dep. at 35-36.[18]

---

[18] Also unfortunate for these excluded employees is that the City's waiver requirement, which only applied to disability benefits, kept the employee out of the entire retirement system at least until the waiver was executed.

**B.     Does this practice violate the ADA?**

Plaintiffs contend that the City's decision to deny entry into the System to any employee with a pre-existing medical condition violates the current and prior versions of the ADA.  Although those employees could subsequently obtain entry into the System by signing a waiver, at the Hearing, Plaintiffs maintained that the practice of categorically excluding employees with medical conditions from the System as an initial matter, regardless of whether the employees could thereafter join the System via a waiver, constitutes a discriminatory practice.  (Doc. 120; Hrg. Tr. at 41-42).  Thus, the Court must determine whether requiring any employee with a pre-existing medical condition to sign a waiver acknowledging that the employee is not entitled to disability benefits for any disabilities arising from the pre-existing condition, and denying entry into the System until this waiver is signed, violates the ADA as prohibited discrimination against qualified individuals on the basis of disability.

Under § 12112(a) of the ADA, "no covered employer may use the disability of an otherwise qualified person as an excuse for discrimination in hiring, promotion, discharge, compensation, training, or 'other terms, conditions, and privileges of employment.'"  See Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1447 (11th Cir. 1998) (quoting 42 U.S.C. § 12112(a)).  "Thus, the ADA prohibits 'a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason.'"  Id. (quoting McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996)).  Generally, the old and new versions of the statute both elaborate that the term "discriminate against a qualified individual on the basis of disability" includes, in relevant part:

28

(1) limiting, segregating, or classifying a[n] . . . employee in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee; . . .

(3) utilizing standards, criteria, or methods of administration–
    (A) that have the effect of discrimination on the basis of disability; . . .

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity is shown to be job-related for the position in question and is consistent with business necessity.

See 42 U.S.C. § 12112(b).  Because Plaintiffs are proceeding solely under a theory of disparate treatment, to the extent Plaintiffs rely on these forms of discrimination, Plaintiffs must still show that the City's standard operating procedure was intentional disability discrimination.  Thus, for example, Plaintiffs' argument that the City's practice violates 42 U.S.C. § 12112(b)(6) as a selection criteria that excludes or tends to exclude a class of individuals with disabilities, is unavailing in that it relies on a theory of disparate impact discrimination.  See Raytheon, 540 U.S. at 54 (citing Grano v. Dep't of Dev. of City of Columbus, 637 F.2d 1073, 1081 (6th Cir. 1980)); Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003).  Indeed, in the briefing, Plaintiffs assert this § 12112(b)(6) argument in precisely the manner rejected by the Supreme Court in Raytheon.  After the City offered the waiver requirement as the purportedly neutral explanation for the exclusion of the Class Members, Plaintiffs argued that this policy is not a "legitimate non-discriminatory" reason for excluding Class Members because it had the "effect" of blocking employees with disabilities from joining the System, and it was not consistent with "business necessity."  See Plaintiffs' Renewed Motion at 22-23; Plaintiffs' Response at 18-19.  As discussed further

29

below, these are factors which "pertain to disparate-impact claims but not disparate-treatment claims."  See Raytheon, 540 U.S. at 54; see also infra pp. 40-41.  Although the Amended Complaint includes an allegation tracking the language of § 12112(b)(6), see Amended Complaint ¶ 15(f), Plaintiffs have litigated this case solely as a disparate treatment action,[19] counsel continued to maintain at the Hearing that Plaintiffs are proceeding solely under a theory of intentional discrimination, and Plaintiffs' Proposed Order emphasizes that this is a disparate treatment case.  See Plaintiffs' Proposed Order at 15.  Further, Plaintiffs have steadfastly argued that the Teamsters framework, which requires proof of discriminatory intent, applies to this case.  As such, following Raytheon, the Court cannot allow Plaintiffs to merge disparate impact factors into its disparate treatment claim.

Rather, to prevail on their pattern or practice claim, Plaintiffs must establish the City's discriminatory motive.  Here, the parties essentially agree that the City had a practice of denying entry into the System to employees with pre-existing conditions unless those employees signed a waiver, while employees without any condition were admitted without a waiver.  As such, the City utilized a practice which treated employees with "pre-existing conditions" differently than employees without such conditions.  Thus, the Court considers

---

[19]    Indeed, in Plaintiffs' initial Motion for Summary Judgment, which Plaintiffs expressly reincorporate into the Renewed Motion, Plaintiffs assert that the City violated the ADA as follows: (1) administering a medical examination for the discriminatory purpose of identifying and excluding persons with disabilities from the System in violation of 42 U.S.C. § 12112(d)(3)(C), (2) excluding from the System persons whom the City found to have disabilities in violation of 42 U.S.C. § 12112(a), and (3) excluding all Class Members from participating in the System solely because the City regarded them as disabled within the meaning of the ADA, in violation of 42 U.S.C. § 12112(a).  Plaintiffs' Motion at 14 (emphasis added).

whether disparate treatment on the basis of generic "pre existing conditions" is a disability-based distinction.  Notably, Plaintiffs do not contend that the ADA is violated by the exclusion of pre-existing conditions from disability benefits coverage for members of the System. Counsel conceded at the Hearing that had the Class Members simply been admitted to the System and notified that the pre-existing conditions identified in their pension physicals could not form the basis of a claim for disability benefits, such a practice would not violate the ADA. (Doc. 120; Hrg. Tr. at 41-42).  Indeed, "a uniform pre-existing condition clause, which excludes the treatment of all conditions that pre-date an individual's eligibility for benefits from coverage, is not a disability-based distinction." Morrison v. Unum Life Ins. Co. of Am., Civil No. 06-2400, 2008 WL 4224807, at *6 (W.D. La. Sept. 10, 2008); see also Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 678 (8th Cir. 1996); McLaughlin v. Gen. Am. Life Ins., No. CIV. A. 97-1410, 1998 WL 736689, at *2-3 (E.D. La. Oct. 21, 1998); E.E.O.C. v. Hinsdale Hosp., No. 98 C 3482, 1999 WL 495480, at *4-5 (N.D. Ill. June 30, 1999).

As set forth in the Code, the City applied a uniform requirement that, as a condition of admission to the System, employees must take a pension physical and sign a waiver of the right to disability benefits for any pre-existing conditions identified in the physical.  All qualified employees were subject to this requirement, regardless of whether he or she could be considered disabled, and the evidence indicates that the City required a waiver for pre-existing conditions of all types, severity, and duration.  Although individuals whose physicals did not reveal any pre-existing conditions were admitted into the System without a waiver, given the absence of any condition to waive, this is not a disability based distinction.

31

Instead, the Court finds this requirement analogous to health insurance plans where courts have held that:

> "broad distinctions, which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability.  Consequently, although such distinctions may have a greater impact on individuals with disabilities, they do not intentionally discriminate on the basis of disability and do not violate the ADA.
>
> Blanket pre-existing condition clauses that exclude from coverage of a health insurance plan the treatment of conditions that pre-date an individual's eligibility for benefits under that plan also are not distinctions based upon disability and do not violate the ADA."

Pokorney v. Miami Valley Career Tech. Ctr., No. C-3-94-247, 1997 WL 1764769, at *8 (S.D. Ohio Mar. 31, 1997) (quoting EEOC: Interim Enforcement Guidance on Application of ADA to Health Insurance (June 8, 1993)); see also Krauel, 95 F.3d at 678.  Therefore, just as the City's decision to exclude pre-existing conditions from coverage under its benefits plan is not disability-based discrimination, so too, requiring those employees who may be affected by the exclusion to sign a waiver acknowledging this term does not constitute disparate treatment on the basis of disability.  As the Code itself excluded pre-existing conditions from coverage, employees did not lose any benefits to which they would have otherwise been entitled by signing the waiver, and once admitted to the System, received the same benefits as employees without pre-existing conditions.

Thus, employees with disabilities were given the same opportunity as everyone else to join the System - sign a waiver acknowledging that any pre-existing condition identified in the pension physical would not be covered and join the System, or be placed in the Social Security system.  This is not a case where a defendant "discriminated on the basis of

32

disability in offering its pension plan to anyone.  It did not charge higher prices to disabled people, on the theory that they might require more benefits.  Nor did it vary the terms of its plan depending on whether or not the employee was disabled."  See E.E.O.C. v. CNA Ins. Cos., 96 F.3d 1039, 1044 (7th Cir. 1996) (internal citations omitted); Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1116 (9th Cir. 2000).  Indeed, the City's intent as expressed in the Code was that all qualified City employees would join the System, regardless of the existence of any pre-existing medical condition.  See Defendant's Motion, Ex. C at 3 ("No condition of health shall preclude a person elected or hired by the City from membership . . . .").  Plaintiffs do not argue that the City enforced the pre-existing condition waiver only as to some medical conditions but not others.  As such, the Court concludes that the City's practice makes a broad-distinction, encompassing all manner of conditions and constraining individuals both with and without disabilities, and therefore, under either version of the ADA, this practice does not constitute "discrimination on the basis of disability."

However, despite the seemingly neutral process for joining the System set forth in the Code, the City's procedures for implementing this requirement were inadequate such that numerous employees with pre-existing conditions apparently failed to sign the waiver and were excluded from the System.  As such, Plaintiffs appear to argue that the City intentionally administered the waiver requirement as a means of excluding employees it regarded as disabled.  See Plaintiffs' Renewed Motion at 21.  True, the City's procedures for notifying employees of the process for joining the System and assisting interested employees in completing the waiver process were plainly ineffective.  Because the process

was poorly administered, employees with pre-existing conditions often remained outside the System for extended periods before they were able, if ever, to successfully navigate the waiver process.  See generally Notice of Filing (Doc. 124).  That up to 2,000 City employees were not in the System for at least some period during their employment, despite the terms of the City Charter and Code requiring employees to join the System, evidences a process that was not working properly.  See Jacksonville, Fla. Charter, art. 16, § 16.01; City Code §§ 120.202(a); 120.302(a).  However, to prevail on a class-wide disparate treatment theory, Plaintiffs must show that the City intentionally denied those employees entry into the System on the basis of disability, that is, Plaintiffs must establish that discrimination was the City's standard operating procedure.  See Perryman, 698 F.2d at 1143.  Although the reason these employees did not utilize the waiver process to join the System are not entirely clear, the record is devoid of any persuasive evidence that the City administered the waiver process with an intent to discriminate on the basis of disability.

Generally, a plaintiff demonstrates a pattern or practice of disparate treatment through "'a combination of statistical evidence demonstrating substantial disparities . . . buttressed by evidence of general policies or specific instances of discrimination.'"  See In re W. Dist. Xerox Litigation, 850 F. Supp. 1079, 1084 (W.D.N.Y. 1994) (quoting E.E.O.C. v. Chicago Miniature Lamp Works, 947 F.2d 292, 299 (7th Cir. 1991)).  Here, Plaintiffs present the affidavits of twenty-two employees who state that "the City" told him or her that he or she was not eligible to join the pension because of that individual's particular physical condition

34

revealed during the pension physical.[20]  See Plaintiffs' Motion, Ex. 2; Plaintiffs' Response, Ex. 3; Notice (Doc. 78).  However, although these affidavits attribute statements to "the City," the affiants fail to identify who from the City made the statement, the context of the statement, or any specific facts regarding what was said, or the manner in which it was communicated.  The affidavits do not identify the job title or department of the City's representative who purportedly made these statements or whether they were made by phone, in person, or via letter.  In the absence of any information demonstrating that "the City's" alleged statement was "made by [the City's] agent or employee on a matter within the scope of that relationship and while it existed," these statements are inadmissible hearsay. See Fed. R. Evid. 801(d)(2)(D); Watson v. Adecco Emp't Servs., Inc., 252 F. Supp. 2d 1347, 1353 n.23 (M.D. Fla. 2003) (finding that statements were inadmissible under Rule 801(d)(2)(D) because "there is no record evidence that the Adecco phone caller was an agent speaking within the scope of her agency or employment"); Int'l Telecomm. Exchange Corp. v. MCI Telecomm. Corp., 892 F. Supp. 1520, 1544 (N.D. Ga. 1995); Thomas v. Stone Container Corp., 922 F. Supp. 950, 957 (S.D.N.Y. 1996); see also Kincaid v. Bd. of Trustees, 188 F. App'x 810, 817 (11th Cir. 2006) ("Carter's declaration suffers, however, because it leaves the finder of fact without the opportunity to analyze the conversation.  Without

_____

[20] The City argues that the Court should not consider these affidavits because all but two of them relate to events that occurred prior to the statute of limitations.  See Motion to Strike (Doc. 74) at 2.  However, "'[a] discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.'" Thigpen v. Bibb Cnty., Ga., Sheriff's Dep't, 223 F.3d 1231, 1243 n.19 (11th Cir. 2000) (alterations in original) (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)) abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-17 (2002).

presenting any indication of the actual words used during the alleged conversation, [plaintiff] asked the magistrate judge to accept [the declarator's] conclusory interpretation of the conversation."). As such, the Court determines that the vague, generalized, hearsay statements contained in the affidavits do not constitute probative anecdotal evidence of discrimination and are not sufficient to raise an issue of material fact on summary judgment. See Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) ("[Plaintiff] cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial."); McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996).

Moreover, even if the affidavits were admissible evidence, the Court would find them insufficient to create a material issue of fact. In the first affidavit, the affiant states her name, employment dates with the City, and most recent job title. (Doc. 70-1 at 1). Next, she asserts that, at the time the City hired her, "the City sent me for a pension medical examination to decide whether I could be a member of one of the two pension plans that make up the City of Jacksonville Retirement System," and that "I took the medical examination as directed by the City." Id. She then concludes with the assertion that "Shortly after I took the pension medical examination, I was informed by the City that I was not eligible to be a member of the City of Jacksonville Retirement System and of the pension plan that covered my job title because I had diabetes." Id. Every affidavit thereafter is an exact replica of this document with only the name, employment date, job title, and medical condition changed to reflect the particular affiant.[21] (Docs. 70-1, 75-4, 78-1). Not one

---

[21] Some of the affidavits contain an additional paragraph explaining how the particular
(continued...)

affidavit deviates from this form, and all but one use the identical language quoted above.[22]
Most significantly, the affidavits are all devoid of any specific facts describing an employee's
individual experience. Thus, even if this "evidence" is not excluded as hearsay, the affidavits
are entirely too formulaic and conclusory to create a material issue of fact. Notably, none
of the affiants mention whether he or she knew about the waiver requirement, if he or she
attempted to sign a waiver but was thwarted in doing so, or if he or she was ever able to join
the System while employed with the City.

Plaintiffs also rely on a January 24, 2007 email to several city managers by Chief of
Personnel William Marshall as purported anecdotal evidence of discriminatory intent.
See Plaintiffs' Response, Ex. 1 (Doc. 75-2). In response to an email containing a
"spreadsheet for all COJ employees currently enrolled in Social Security," Marshall writes:

> Everyone on the list is a civil service COJ employees. We filtered out the
> appointed employees and officials. There are 1,015 on the list. We need help
> to get these folks into the plan. We need some way to conclude that they are
> refusing the Pension because of a waiver and accepting Social Security.

See id. According to Plaintiffs, this email is evidence of "an unscrupulously misleading
attempt to justify the fact that the employees were still being excluded from the plans." See
Plaintiffs' Response at 15; Plaintiffs' Renewed Motion at 21. However, the Court does not

---

[21](...continued)
medical condition limits that employee's abilities, but the quoted language remains the same.
(Docs. 75-4; 78-1).

[22] In one affidavit, rather than the sentence which begins "the City sent me for a pension
medical examination," this affiant states that "I was advised by the City not to take the
pension physical because I informed the City that I had Chron's disease and I had an
elevated liver count." (Doc. 75-4 at 1). The remainder of this affidavit is true to form. Id.

find the Marshall email to constitute probative evidence of discriminatory intent. The meaning of this email is unclear, but Plaintiffs' interpretation of the email as evidencing an intent to use the waiver requirement as a cover for excluding disabled employees from the System is strained at best. See Plaintiffs' Renewed Motion at 21. Indeed, Marshall expresses an interest in moving employees into the System, not keeping them out. While the email demonstrates the City's undeniable problem in poorly administering the enrollment process and documenting the pension preferences of its employees, there is nothing about the email which suggests that these employees were deliberately excluded from the System due to some actual or perceived impairment.

In addition, Plaintiffs argue that the City's poor documentation of the waiver process indicates the City's discriminatory intent. Plaintiffs' Renewed Motion at 23; Plaintiffs' Reply at 9. The City has produced several examples of waiver request forms, letters from doctors recommending a waiver, and letters to employees with the waiver itself. See City's Motion, Ex. D; City's Supplemental Motion, Exs. S-T. Eight of the waiver-related documents submitted by the City pertain to named Plaintiffs in this case. See City's Supplemental Motion, Ex. S at 2, 11, 21, 25, 30, 35, 40, 43. The City also produced documents indicating that Plaintiffs Hernandez and Sames were not enrolled in the System due to a failure to submit additional medical tests. See City's Motion, Exs. M, P. Following the Hearing, the City filed all of the Class Members' waiver-related documents in its possession, which amounted to 765 pages of paperwork pertaining to ninety-four City employees total. See Sealed Exhibits (Doc. 125). The Court fully acknowledges that in light of the large number of Class Members, the number of waiver-related letters and forms produced by the

City is shockingly small.  Nonetheless, counsel for Plaintiffs stated at the Hearing that he had no basis to challenge the testimony of Ray and Poppell regarding the process for administering the waiver requirement.  (Doc. 120; Hrg. Tr. at 52).

Moreover, Plaintiffs offer no evidence to connect the City's poor record-keeping with a discriminatory motive.  Indeed, "[e]vidence of lapses in the employer's record-keeping cannot on its own establish a pretext claim."  See Harding v. Careerbuilder, LLC, 168 F. App'x 535, 539 (3d Cir. 2006).  Rather, "[p]oor documentation by the employer of the basis for its asserted reason will strengthen a plaintiff's case if the plaintiff has evidence of an alternative reason, evidence that the asserted reason had no basis in fact, or evidence that the employer intentionally destroyed or concealed the relevant documents."  Id.  Plaintiffs have not submitted any of these types of evidence, and as such, the Court cannot draw the inference that the City's failure to produce more waiver forms indicates that the application process was designed to exclude disabled employees from the System.  See Casillas v. U.S. Navy, 735 F.2d 338, 345 (9th Cir. 1984) ("No evidence, however, showed that the failure to keep records was only a pretext to shield a discriminatory decision that otherwise could have been documented but for the Navy's desire to shield it.").

Finally, Plaintiffs contend that the waiver requirement had a discriminatory effect of disproportionately excluding disabled employees from the System, and as such, the Court should infer an intentionally discriminatory intent.  See Plaintiffs' Renewed Motion at 23. Plaintiffs add that such an inference is especially warranted because a waiver was unnecessary given that pre-existing conditions were already excluded from coverage under the terms of the Code.  Id.  Plaintiffs also maintain that the City could have administered its

pension and disability plans differently so as not to cause this disparate impact, and therefore, the waiver requirement is not consistent with business necessity. <u>See</u> Plaintiffs' Reply at 6-7. However, whether the City's practice was consistent with "business necessity" is a question that pertains only to disparate impact claims. <u>Raytheon</u>, 540 U.S. at 53-54. Moreover, to the extent Plaintiffs now argue that a "good faith attempt to neutrally administer the plan," would still constitute prohibited discrimination because it had the "effect" of blocking employees with disabilities from the System, <u>see</u> Plaintiffs' Renewed Motion at 23, this argument is misplaced. <u>See Raytheon</u>, 540 U.S. at 53-54. As Plaintiffs' claims are premised on disparate treatment, Plaintiffs must show a pattern or practice of <u>intentional</u> discrimination. If the City excluded the Class Members from the System as a result of their failure to comply with a neutrally administered waiver requirement, then their exclusions cannot be said to have been motivated by their purported disabilities. <u>Id.</u> at 55. Thus, the Court considers only whether Plaintiffs have offered sufficient evidence to conclude that the Class Members were actually excluded from the System because the City regarded them as disabled. Whether the waiver policy violates the ADA based on its allegedly disparate impact on disabled individuals is not the question before the Court and, as Plaintiffs' counsel affirmed at the Hearing, not the basis for Plaintiffs' claims. (Doc. 120; Hrg. Tr. at 51, 58-59).

Nonetheless, although this is not a disparate impact case, disparate impact evidence is still relevant to the analysis because strong statistical evidence of disparate impact can be, and often is, used to demonstrate a pattern or practice of disparate treatment. <u>Joe's Stone Crab, Inc.</u>, 220 F.3d at 1287. However, Plaintiffs do not present the type of statistical analysis from which the Court could draw the conclusion that unlawful animus motivated the

City's pension decisions.  Indeed, despite repeated requests for a more complete evidentiary record, the Court has only a rough estimate that up to 2,000 employees were "supposed to be" in the System, but were not.  See Ray Dep. at 36-38, 63.  Plaintiffs have not presented any analysis of how that statistic relates to the number of City employees in total, the number of City employees in the System, or the number of employees in the System via the waiver process.  Additionally, Plaintiffs do not offer any information regarding how many of these 2,000 employees may have intentionally declined to sign a waiver and elected to receive social security benefits.   As such, the Court has no way of comparing the number of excluded employees to the number of City employees who were able to complete the application and waiver process, or were otherwise able to join the System despite having a pre-existing condition.  Without this information, the Court cannot assess the actual disparate impact of the challenged practice, that is, the Court cannot compare the number of employees with pre-existing conditions (much less actual disabilities), who are not in the System with the number of City employees having such conditions who are in the System.  As a result, it is difficult, if not impossible, to determine how great the "disparity," if any, actually is.  See Kilpatrick v. Tyson Foods, Inc., 268 F. App'x 860, 863 (11th Cir. 2008) ("[Plaintiff's] statistical evidence failed to establish a pattern and practice of discrimination. Not only did [plaintiff's] statistical evidence bunch together employees who left [employer] voluntarily with those who were fired, it was not set within any analytical framework by which to substantiate [plaintiff's] proffered conclusion.").

Where statistical evidence is lacking, Plaintiffs must come forward with strong anecdotal evidence of discrimination.  See In re W. Dist. Xerox Litigation, 850 F. Supp. at

1085.  As discussed above, Plaintiffs' anecdotal evidence is not sufficiently probative of any discriminatory intent.  For example, Plaintiffs do not offer evidence of a single class member who, having signed the waiver, was not admitted to the System, or was thwarted in his or her efforts to sign a waiver.  Nor do Plaintiffs offer evidence that employees with minor pre-existing conditions were offered a waiver and admitted to the System while those with more serious conditions were kept out.

Considering all the evidence as a whole, and viewing it in the light most favorable to Plaintiffs, the Court finds that Plaintiffs fail to create a material dispute as to whether the City had a pattern or practice of intentionally treating employees with actual or perceived disabilities differently than non-disabled employees.  See Perryman, 698 F.2d at 1143.  At best, Plaintiffs show that approximately 2,000 City employees took a pension physical and following that examination, were not put in the System because of a "medical issue."  The evidence indicates that this "medical issue" constitutes any multitude of dissimilar medical and physical conditions, of varying severity and duration, as well as, in some cases, no condition at all but a failure to submit required test results.  At the Hearing, Plaintiffs conceded that they have no reason to dispute that when a pre-existing medical condition was identified in the pension physical, the City's practice, although poorly executed, was to deny initial entry into the System but offer that employee the opportunity to sign a waiver for the pre-existing condition.  The employee could then sign the waiver form and join the System, or elect Social Security benefits.[23]  To the extent Plaintiffs contend that the City

---

[23] It appears employees could also choose to retake the pension physical in six months (continued...)

utilized the waiver requirement for a discriminatory purpose, Plaintiffs offer no evidence that the haphazard and inconsistent way in which the City administered the waiver process was done deliberately to exclude employees that the City perceived to be disabled.[24]

In assessing Plaintiffs' anecdotal and statistical evidence, the lack of one type of evidence or the other is not necessarily fatal to a plaintiff's case. See In re W. Dist. Xerox Litigation, 850 F. Supp. at 1084. However, "[w]hen one type of evidence is missing altogether, the other must be correspondingly stronger for plaintiffs to meet their burden." Id. at 1085. Here, Plaintiffs have neither. The record is devoid of any specific facts supporting any specific instances of disability discrimination. Moreover, in the absence of any analytical framework in which to analyze the bare evidence that approximately 2,000 employees were not in the System, this statistic alone does not show a "substantial disparity" on the basis of disability, much less a disparate impact that raises the inference of intentional discrimination.

The Court has little doubt that the process for joining the System was ineffective, and that the City's efforts in ensuring that its employees joined the System, as the City Code

---

[23](...continued)
and join the System without a waiver if the medical issue was resolved in the interim. See Poppell Dep. at 26-27.

[24] Notably, when Calvin Ray discovered that a number of employees were not in the System, the City reached out to its employees "en mass with the information that there is a waiver process available, you can join at any time, you have the opportunity to buy back past service with the City." Ray Dep. at 8-11. Ray testified that following the communication, "[we] braced ourselves for, you know, a lot of people lined up at pension admin's doorway to enroll, or HR more appropriately probably, and it didn't occur. We did not have, you know, a mass of employees producing themselves in our doorway to become enrolled." Id. at 12.

intended, left much to be desired.  However, there is simply no evidence in the record from which a factfinder could conclude that this failure was due to a pattern or practice of intentional disability discrimination.  While the Court does not rule out that the City's actions may run afoul of some other provision of federal, state or municipal law, the City's conduct does not fall within the specific ADA claims brought here.[25]

Thus, the Court will grant the City's Renewed Motion as to Plaintiffs' class action pattern or practice claim, and deny Plaintiffs' Renewed Motion.  Because the class action fails, it appears that "all that remains are the claims of the individual class members, and those claims will be litigated under the familiar McDonnell Douglas burden-shifting framework."  See Davis, 516 F.3d at 966.  Nonetheless, it is unclear whether Plaintiffs intend to proceed with their individual claims in the absence of a class action.  As such, the Court will direct the parties to confer and file a joint notice on or before December 15, 2014, indicating how they intend to proceed with this case in light of the Court's ruling.

## V.    Conclusion

It appears that paperwork snafus, poor record-keeping, and the City's inconsistent administration of the waiver process kept many City employees from being enrolled in the City's Retirement System as they were "supposed to be."  While the Court has ruled that the City's practices did not violate the ADA on a class-wide basis, this does not prevent the City from fashioning some equitable remedy for the affected employees.  Nor does the Court rule out that the parties could resume their long-running negotiations to try to reach a fair

---

[25] Given this ruling, the Court need not reach the myriad of other difficult and complex issues identified in the Court's September 11, 2012 Order (Doc. 91).

44

resolution.  In fact, the Court encourages the parties to do so and stands ready upon request to assist the parties in facilitating their settlement discussions.

Accordingly, it is

**ORDERED:**

1.    Defendant's Renewed Motion for Summary Judgment (Doc. 109) is **GRANTED** as to Plaintiffs' class action claims.  This case will not proceed as an ADA class action.

3.    Plaintiffs' Renewed Motion for Summary Judgment (Doc. 107) is **DENIED.**

4.    Plaintiffs' Motion to Strike Defendant's Reply (Doc. 115) is **DENIED**.

5.    The parties shall have up to and including **December 15, 2014** to file a joint notice indicating how they intend to proceed in this action.

**DONE AND ORDERED** at Jacksonville, Florida this 30th day of September, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

mhm.
Copies:

Counsel of Record